STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK LEONARDIS, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. STEPHEN ROSE, DEFENDANT-APPELLANT, AND MICHAEL BATTAGLIA AND DALE BATTAGLIA, DEFENDANTS.

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. FREDERICK JOHN STRYCHNEWICZ, DEFENDANT-RESPONDENT.

Argued January 27, 1976—Decided July 21, 1976.

86

Mr. *Dennis P. LaHiff* argued the cause for appellant Leonardis (*Messrs. Messineo and Messineo,* attorneys).

Mr. *Leopold Monaco* argued the cause for appellant Rose (*Messrs. Monaco and Oratio,* attorneys).

Mr. *John A. McLaughlin,* First Assistant Prosecutor, argued the cause for appellant Hudson County Prosecutor (*Mr. James T. O'Halloran,* Hudson County Prosecutor, attorney; *Mr. William Z. Shulman,* Assistant Prosecutor, on the brief).

Mr. *John J. Langan, Jr.* argued the cause for respondent Bergen County Pretrial Intervention Program (*Mr. Vincent P. Rigolosi,* attorney).

Mr. *Richard J. Williams* argued the cause for *amicus curiae* New Jersey Prosecutors Association (*Mr. Marc J. Friedman* of counsel and on the brief).

*Mr. Ezra D. Rosenberg* argued the cause for *amicus curiae* Office of the Public Defender (*Mr. Stanley Van Ness,* Public Defender. attorney; *Mr. Rosenberg* of counsel and on the brief).

The opinion of the Court was delivered by

PASHMAN, J. These three appeals were joined to consider the validity of certain aspects of the pretrial intervention programs (PTI) established in Bergen and Hudson Counties pursuant to *R.* 3:28.[1] The issues posed by these appeals are not identical, though the questions they raise all concern the fundamental nature and fairness of PTI.

The pretrial intervention program is an alternative procedure to the traditional process of prosecuting criminal defendants. It is intended to augment the criminal justice system where prosecution would be counterproductive, ineffective or unwarranted. Sponsored in conjunction with various counseling and training services, PTI serves a rehabilitative purpose and ameliorates the stigma which is imposed on criminal defendants. While PTI may incidentally provide prosecutors with another means to dispose of cases and the opportunity to reduce the backlog of litigated cases which

---

[1] Rule 3:28 provides in relevant part:

RULE 3:28. PRETRIAL INTERVENTION PROGRAMS

(a) In counties where a pretrial intervention program is approved by the Supreme Court for operation under this rule, the Assignment Judge shall designate a judge or judges to act on all matters pertaining to the program, with the exception, however, that the Assignment Judge shall him or herself act on all such matters involving treason, murder, kidnapping, manslaughter, sodomy, rape, armed robbery, or sale or dispensing of narcotic drugs by persons not drug-dependent.

(b) Where a defendant charged with a penal or criminal offense has been accepted by the program, the designated judge may, on the recommendation of the Trial Court Administrator for the county, the Chief Probation Office for the county, or such other person approved by the Supreme Court as program director, and with the consent of the prosecuting attorney and the defendant, postpone all further proceedings against said defendant on such charges for a period not to exceed 3 months.

currently plagues the courts, it relieves a selected class of criminal suspects of the time-consuming and often debilitating rigors of the criminal process.

Two defendants in the instant matter, Leonardis and Rose, sought admission to the pretrial intervention program of Bergen County; Strychnewicz sought admission to the Hudson County program. The appeals of defendants Leonardis and Rose are closely related due to similar dispositions by the trial court. Leonardis was arrested by the Bergen County Narcotics Task Force for possession of marijuana, a controlled dangerous substance and charged with violating *N. J. S. A.* 24:21–19(a)(1). In an unrelated matter, Rose was arrested and indicted for possession of marijuana and for conspiracy with two other individuals to possess and distribute a controlled dangerous substance, contrary to *N. J. S. A.* 24:21–19(a)(1) and 24:21–24. Both Leonardis and Rose applied for admission to the PTI program established in Bergen County under *R.* 3:28. After perfunctory interviews by program officials, defendants were denied admission.[2] These denials were based on exclusionary criteria established by the Bergen County program in conjunction with the basic court rule.[3] In particular, these criteria exclude

---

[2]An application for admission to the Bergen County Program by Rose was initially rejected because of his alleged ineligibility as a resident of Connecticut. Because he was a resident student at The Teaneck campus of Fairleigh Dickinson University, Rose moved for an order by the trial court directing the project director of the PTI to review defendant's application for admission. His motion was granted and defendant was subsequently informed by letter that he was "rejected by the program Director as not qualified."

[3]The preface to, and first provision of the Bergen County PTI Project Exclusionary Criteria are as follows:

Flexible guidelines have been adopted which are designed to produce a class of participants most amenable to the precepts of the Project.

The focus of the Project is upon the possibilities of attitudinal and behavioral change of each defendant. Consequently, the Project will accept defendants charged with practically any offense. Some offenses, however, are of sufficient severity to prejudice po-

individuals who are charged with certain "Heinous Offenses," among which is the "Sale of a Controlled Dangerous Substance."

Defendants filed separate motions for an order directing the Program Director to accept their applications. The motions were heard together with that of a third defendant by the judge designated by the assignment judge under *R.* 3: 28(a). In his oral opinion denying these motions, the judge stated:

> Now, the Court has taken the position all along — and I don't think its position is unknown — I have taken the position in previous matters before me that there is no fundamental right to pretrial intervention at all as long as the eligibility criteria [sic] does not discriminate against what we might call a constitutional protective [sic] class such as one founded on race or wealth. But the State need only demonstrate the criteria is [sic] relevant and has basis for which the classification is made
>
> \* \* \* \* \* \* \* \*
>
> In any event, I don't feel that there is any arbitrary action in this particular matter here before me. I think they have a right to interpret the program, the intervention project, as they did under the circumstances. The project which was approved says that ordinarily drug offenses, sale of dangerous drugs, are not, must be excluded. And I haven't found anything here which is before me which indicate [sic] there should be an exception in this particular case.

Defendant subsequently filed motions for leave to appeal to the Appellate Division, which were denied. Similar motions filed with this Court were granted.

---

tential employers, incite society's vengeance or in some other manner render the defendant inappropriate for participation. Other offenses indicate a likelihood of serious psychological disorder.
Persons who come within the following criteria must ordinarily be excluded:
A. *Type of Offense*:
 1. *Heinous Offenses*: Atrocious Assault and Battery where the victim is seriously injured; Homicide; Mayhem, Forceable Rape; Assault and Battery on a Police Officer involving injury; Armed Robbery where the victim is injured; Sale of a Controlled Dangerous Substance. Although these offenses may not prejudice some employers, there is the additional factor of society's expectation in cases of this nature which may require exclusion.

Defendant Strychnewicz was indicted in Hudson County for possession of and possession with intent to distribute hashish, a controlled dangerous substance, in violation of *N. J. S. A.* 24:21–20(a) and 24:21–19(a)(1) respectively. Defendant applied for and was denied admission to the Hudson County Pretrial Intervention Program because the County Prosecutor would not consent to a postponement of proceedings under *R.* 3:28(b). Defendant moved to compel the prosecutor to provide a written explanation for his refusal to consent. After the motion was granted, the prosecutor sought leave to appeal to the Appellate Division which motion was denied. A comparable motion was presented to this Court and granted.

I

## PRETRIAL INTERVENTION AS A PROCEDURAL ALTERNATIVE

Pretrial intervention represents a procedural alternative to the traditional system of prosecuting and incarcerating criminal suspects, and was intended as a response to deficiencies in that system. Although the deficiencies which PTI attempts to address have existed for years, PTI is a fairly recent innovation, and has developed only within the last decade. While all PTI programs have common objectives and a common origin, they have exhibited substantial diversity in program goals and operational formats. An understanding of the premises upon which PTI rests is vital to comprehend the diverse ways in which the programs have been implemented, especially in New Jersey where programs differ from county to county.

In addition, an assessment of the purposes of pretrial intervention will provide a benchmark by which to measure the particular programs challenged here and the general scheme established pursuant to *R.* 3:28.

A. *The Administrative Evolution of Pretrial Intervention.*
 1. *Early Implementation of the PTI Concept*

While the origins of PTI may ultimately be found in traditional criminal procedures such as parole and probation, the formalization of that concept has emerged only during the last decade.

The initial impetus for development of PTI came from a 1967 report compiled by the President's Commission on Law Enforcement and Administration of Justice. *See President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society* (1967) [hereinafter referred to as The President's Comm'n.] This report, which was based upon a nationwide study, expressly recognized the desirability of alternative means for the disposition of criminal cases. In particular, it noted that due to the unsatisfactory performance of the criminal justice system, there was a need for prosecutorial options to augment those traditionally exercised by law enforcement authorities. The lack of sufficient resources, the often debilitating effects on a suspect from introduction to the criminal process and the failure of the system to rehabilitate criminal offenders were all cited as warranting attention. The Commission found that resolution of these problems might be accomplished by diversion of cases from the criminal process prior to prosecution. However, the report also recognized that the lack of information and the absence of clearly defined standards and procedures would initially frustrate the decisions of prosecutors concerning cases to be diverted. Consequently, the Commission recommended that:

Prosecutors should endeavor to make discriminating charge decisions, assuring that offenders who merit criminal sanctions are not released and that other offenders are either released or diverted to noncriminal methods of treatment and control by:

Establishment of explicit policies for the dismissal or informal disposition of the cases of certain marginal offenders.

Early identification and diversion to other community resources of those offenders in need of treatment, for whom full criminal disposition does not appear required. [1 The President's Comm'n, *supra,* at 134].

Within a year of the publication of the Commission's report, two pilot PTI programs were established according to the general guidelines presented in the report. These programs, the Manhattan Court Employment Project and Project Crossroads in Washington, D. C., provided for the diversion of criminal cases involving juveniles, first-time offenders and defendants accused of committing misdemeanors and specified felonies. The identification of these individuals was intended to isolate suspects for whom prosecution in the traditional sense would be unnecessary, ineffective or counterproductive. The projects also sought to provide alternatives to defendants for whom rehabilitation was possible. In exchange for the suspension of prosecution, these individuals were required to participate in a community-based rehabilitation program which included counseling, training and job placement. *See generally*, Nat'l Pretrial Intervention Service Center, *Descriptive Profiles on Selected Pretrial Criminal Justice Intervention Programs*, 21–25 (1974) [hereinafter referred to as *Descriptive Profiles*] ; Note, "Pretrial Diversion from the Criminal Process," 83 *Yale L. J.* 827, 828–830 (1974) ; Note, "Pretrial Intervention Programs," 28 *Rutgers L. Rev.* 1203, 1207–1209 (1975).

The initial successes attained by these programs in terms of reduced recidivism and promotion of employable skills prompted the establishment of "second-round" programs in other cities which were modeled after the original pilot projects.[4] *See generally*, Vera Institute of Justice, *The Manhattan Court Employment Project: Final Report* (1972) ; Nat'l Comm. for Children & Youth, *Final Report: Project Crossroads* (1971) ; *Descriptive Profiles, supra,* at 24–25 ;

---

[4]These "second-round" programs were established in Atlanta, Baltimore, Boston, California Bay area (Hayward, San Jose, Santa Rosa), Cleveland, Minneapolis, Newark and San Antonio. The necessary funding was provided by the United States Department of Labor under the Manpower Development and Training Act of 1962, 42 *U. S. C. A.* §§ 2571 *et seq. See* Note, *supra*, 83 *Yale L. J.* at 829, n. 13 ; Note, *supra*, 28 *Rutgers L. Rev.* at 1208 n. 34.

Gorelick, "Pretrial Diversion: The Threat of Expanding Social Control," 10 *Harv. Civ. Rights-Civ. Lib. L. Rev.* 180, 194–200 (1975). These programs were, in turn, followed by programs in other locales. The diversity of these programs underscores the experimental nature of the PTI concept. Although most programs were instituted and administered in accordance with prosecutorial discretion (*see* Note, 83 *Yale L. J.* at 827; Note, 28 *Rutgers L. Rev.* at 1209); some states, such as New Jersey, have authorized PTI programs by court rules, *N. J. R.* 3:28; *Pa. R. Crim. P.* 175, *et seq.*, and two states have even resorted to formal legislation to enact PTI programs, *Cal. Penal Code* § 1000, *et seq.; Mass. Laws Ann.* ch. 276A §§ 1–9 (Supp. 1975). These various programs also differ in terms of their breadth and their ambition. While a majority of them are comprehensive in scope, *see generally, Descriptive Profiles, supra;* Nat'l Pretrial Intervention Service Center, *Directory of Criminal Justice Diversion Programs* (Rev. 1975), others confine their attention to individuals suspected of committing particular crimes, Robertson, "Pretrial Diversion of Drug Offenders," 52 *B. U. L. Rev.* 335 (1972); Note, "Addict Diversion: An Alternative Approach for the Criminal System," 60 *Geo. L. J.* 667 (1972); *Descriptive Profiles, supra,* at 37–39 (Project F.O.U.N.D. (Baltimore) — property crimes). In short, PTI programs share a common background, but have assumed no uniform structure. Nonetheless, the success of these programs has encouraged more and more state and local authorities to initiate and develop PTI programs of their own.[5]

---

[5]We note the strong similarities which exist between the PTI programs established under *R.* 3:28, and the drug rehabilitation program prescribed by *N. J. S. A.* 24:21–27. This latter type of program, which was recently considered by this Court in *State v. Alston*, 71 *N. J.* 1 (1976) and *State v. Sayko*, 71 *N. J.* 8 (1976), has also been adopted by a variety of other jurisdictions. *Conn. Gen. Stat. Ann.* §§ 19–484,–497; *Mass. Gen. Laws Ann. ch.* 123, §§ 38–55; *Ill. Rev. Stat.* ch. 91–1/2, § 120.1 *et seq. N. Y. Mental Hygiene*

## 2. *Purposes and Practical Implementation of the P.T.I. Concept.*

Although PTI programs may differ in scope and procedure, they all serve the same general purposes. These purposes are summarized by one commentator as follows:

> The primary goals of diversion are two-fold. The first is the early identification and referral of defendants who are in need of treatment. This may be the most effective way to rehabilitate them and return them to the community as productive citizens. Second, diversion serves to dispose quickly and inexpensively of cases which are more effectively handled without full criminal disposition. This permits the court to focus its attention and concentrate its resources on those cases where deterrence and rehabilitation can best be achieved by ordinary criminal processing. [Note, *supra*, 60 *Geo. L. J.* at 673]

While it is the unification of these purposes — expeditious disposition and rehabilitation — which particularly characterizes the PTI concept, it should be noted that they often serve different ends.

Expeditious disposition, of course, is not a new objective for either prosecutors or the judiciary. Informal diversion of criminal defendants to achieve this goal existed prior to any attempt to formally implement diversion through PTI programs. For instance, prosecutors have traditionally exercised the option of dismissing charges or declining to proceed with prosecution. *See generally,* 1 The President's Comm'n, *supra,* at 133; Nat'l Advisory Comm'n on Crim. Justice Standards and Goals, *Courts* 17–26 (1973) [hereinafter referred to as *Courts;* Ferguson, "Formulation of Enforcement Policy: An Anatomy of the Prosecutor's Discretion Prior to Accusation," 11 *Rutgers L. Rev.* 507 (1957); Goldstein, "Police Discretion Not to Invoke the Criminal Process: Low-Visibility Decisions in the Administration of Justice," 69 *Yale L. J.* 543 (1960); Kaplan, "The Prosecu-

torial Discretion — A Comment," 60 *Nw. U. L. Rev.* 174 (1965) ; Note, "Prosecutor's Discretion," 103 *U. Pa. L. Rev.* 1057 (1955) ; Comment, "Prosecutorial Discretion in the Initiation of Criminal Complaints," 42 *S. Cal. L. Rev.* 519 (1969). PTI programs have retained many of the same advantages which attend a prosecutor's informal decision to divert prior to criminal prosecution. In this way, pre-trial intervention provides one means of addressing the problems of congestion and backlog of cases which currently confront our prosecutors, public defenders and courts. To the extent that a PTI program averts the costs of processing these cases, it also permits a more efficient use of the limited resources available to law enforcement authorities. Nat'l Advisory Comm'n on Crim. Justice Standards and Goals, *Corrections* 74–76 (1973) [hereinafter referred to as *Corrections*]. Note, *supra,* 10 *Harv. Civ. Rights-Civ. Lib. L. Rev.* at 193. Furthermore, pretrial intervention affords prosecutors with alternatives to prosecution and therefore increases their flexibility to respond to individual cases. As a study by the National Advisory Commission on Criminal Justice Standards and Goals reported:

> Perhaps the major benefit of diversion is that it broadens the resources that can be used to deal with offenders. Under existing circumstances, it permits dispositions of offenders that would be difficult or impossible as sentencing alternatives. Because of its informality and flexibility, diversion also is likely to encompass more programs than could be made available as sentencing alternatives.
>
> [*Courts, supra,* at 28]

While PTI programs provide most of the advantages which are traditionally associated with prosecutorial discretion, their formal structure at the same time places restrictions on the exercise of that discretion.[6] By providing guidelines

---

[6]With regard to this point, one commentator has observed:

Proponents of PTI programs view them as superior to traditional diversion practices. The low visibility of informal diversion increases the likelihood of decisions that deny due process because

for the proper diversion of cases, they furnish standards of discretion thereby assuring a uniformity and predictability which are not characteristic of the *ad hoc* decisions of prosecutors. *See Administrative Office of the Courts, Proposal for Statewide Implementation of a Uniform Program of Pretrial Intervention Under New Jersey Court Rule 3.28,* 57–91 (1975) [hereinafter cited as *Proposal; Courts, supra,* at 32–41; ABA Project on Standards for Crim. Justice, *Standards Relating to The Prosecution Function and The Defense Function,* Standards 2.5, 3.8 (1971) ; 1 The President's Comm'n, *supra,* at 133.[7]

■ ■ While the goal of expeditious disposition is certainly important and central to the PTI concept, it is at the same time subordinate to the rehabilitative function of PTI.[8] *See State v. Nolfi,* 141 *N. J. Super.* 528 (Law Div.

they are arbitrary or based on unacceptable criteria and inducements, . . . . Pretrial intervention seeks to impart some degree of "uniformity, predictability, and evenhandedness to an area of the law where there is perceived to exist an excess of unchecked discretion and unequal application."

[Note, *supra,* 28 *Rutgers L. Rev.* at 1206–07]

[7] In *The Challenge of Crime in a Free Society,* The President's Commission on Law Enforcement and Administration of Justice explicitly recognized the need for such guidelines:

Another want, particularly felt by young, inexperienced assistants in large offices, is the lack of clearly stated standards to guide them in making decisions. Standards should pertain to such matters as the circumstances that properly can be considered mitigating or aggravating, or the kinds of offenses that should be most vigorously prosecuted in view of the community's law enforcement needs. In large offices where no such standards are devised and communicated, it is unlikely that assistants will charge or dismiss in the same manner.

[1 The President's Comm'n, *supra,* at 133]

[8] In one of the few cases to consider the implementation and operation of a PTI program, a California Court of Appeals, explicitly recognized the primacy of the rehabilitative function. *People v. Reed,* 37 *Cal. App.* 3d 369, 112 *Cal. Rptr.* 493 (Ct. App. 1974). In construing the statute under which California PTI programs are administered, the court found:

1976). This function is, in the first instance, performed by the supportive services of the various programs, which generally include training, counseling, education and job placement. *See generally, Descriptive Profiles, supra.* However, the significance of rehabilitation is also apparent in the procedural operation of the PTI program. Because admission to and participation in a PTI program precedes trial and often precedes entry of formal charges, a defendant who successfully completes the program avoids adjudication of his guilt. Furthermore, few, if any, PTI programs require entry of a guilty plea as a prerequisite to admission in a program. *Proposal, supra,* at 35–38; Nat'l Pretrial Intervention Service Center, *Legal Issues and Characteristics of Pretrial Intervention Programs,* 44–52 (1974). Note, *supra,* 60 *Geo. L. J.* at 696. Due to this procedural aspect of pretrial intervention, the often counterproductive stigma of conviction, which accompanies parole and probation, does not attach to participants in a PTI program. This not only furthers the rehabilitative function of PTI, but also provides defendants with a real incentive for enrollment and participation. A national advisory commission which studied the judicial role in the criminal process mentioned this aspect of PTI:

> By taking the offender out of the criminal justice process before conviction, diversion imposes no stigma of conviction, and unlike

---

There appear to be two purposes attendant to the instant enactment. First, the statute has an obvious rehabilitative purpose. First-time drug users are often saddled with a millstone of a criminal record throughout their lives. This enactment seeks to give experimental or accidental drug users a second chance and to provide them with rehabilitative services outside of the criminal process. A second purpose for diversion is that it assists in relieving the congestion of our criminal courts by providing an alternative system of treatment and rehabilitation. *We conclude that the overriding purpose, however, is to effect rehabilitation.* The relieving of crowded court calendars is a collateral benefit which tends to be realized as a byproduct of the process.

[112 *Cal. Rptr.* at 497–98; emphasis supplied]

screening, prevents the offender from committing future harmful acts or requires him to make restitution. Only diversion provides a means of accommodating this compromise solution. If diversion programs were made available as sentencing alternatives, the objective of avoiding the stigma of a criminal conviction would be nullified.
[*Courts, supra*, at 28]

The success of such programs when measured in terms of decreased recidivism, increased job placements and reduced caseloads is ultimately a function of the specific services which they provide. However, a related and equally important sign of success — the ability of a program to encourage and promote successful diversion of criminal cases — is founded to a large extent upon the eligibility criteria which determine admissions to the program. These criteria must mediate between the conflicting interests which underlie PTI. On the one hand, the eligibility criteria must be sufficiently broad to divert as many cases as could possibly benefit from the program consistent with public security. On the other hand, the criteria must be sufficiently discriminatory to assure selection of those applicants who have the best prospects for rehabilitation. To harmonize these interests, the eligibility criteria must be both comprehensive and flexible. Narrow and inflexible criteria, which unduly restrict admissions to the program would be self-defeating and would undermine the efficacy of PTI. The net result of such criteria would be readily measurable in terms of denied opportunities for rehabilitation and fewer cases diverted from the congested dockets of our courts. *Proposal, supra,* at 20–35; Note, *supra,* 83 *Yale L. J.* at 834–35.

█ As a result, proponents of the PTI concept have contended that its function is more readily served by eligibility criteria whose focus is only on the defendant's needs and his amenability to correction. This individualistic approach, they suggest, can best identify those persons who require rehabilitation and whose diversion would present a minimal

threat to the interests of society.[9] As one group study reports:

Among the factors that should be considered favorable to diversion are: (1) the relative youth of the offender; (2) the willingness of the victim to have no conviction sought; (3) any likelihood that

---

[9]In a recent proposal for the implementation of a state-wide uniform pretrial program for New Jersey, the Administrative Office of the Courts discussed the fallacy which underlies admissions criteria based on the crimes of which a defendant is accused:

Exclusion by type of charge, because there is little data, should not be done until and unless it can be shown that the type of charge does, with some reliability, predict an inability to accomplish deterrence from future criminal behavior. To be fair then, *all defendants irrespective generally of charge or record, should be afforded the opportunity of proving their motivation to succeed in the program.*

[*Proposal, supra*, at 33; emphasis supplied]

Consistent with this policy, we think that application to a PTI program may be made by all defendants regardless of the crime with which they are charged. Because we find that the statewide, uniform proposal of the Administrative Office of the Courts (which we approve in substantial portion herein) excludes, in the absence of mitigating factors or circumstances, specified criminal offenders, we deem it necessary to clarify our departure from *Proposal's* general guidelines on this subject.

Although we anticipate that individuals who commit certain crimes may be more or less amenable to rehabilitation, we feel that it would be inconsistent with the purposes of the PTI concept to issue a blanket prohibition against the admission of such defendants. A determination concerning a defendant's admission to a program should therefore be based on a review of his individual characteristics, conducted against the background of the crime charged. This review should be undertaken by the designated judge within each county (except with regard to the offenses specified in *R*. 3:28(a) for which the review will be conducted by the assignment judge) after formal application for admission is submitted to the program. The hearing which this review anticipates should approximate the procedure outlined in subsections c and d of the pretrial intervention rule, subject to the guidelines of *Proposal* and our own modifications herein. Upon this determination of a defendant's propensity for correction, the designated judge should issue a statement of reasons underlying his decision to grant or deny admission. Contrary to the suggestions presented in *Proposal*, we find this decision to be appealable on an interlocutory basis to the Appellate Division, *R*. 2:2–4, and ultimately to this Court, *R*. 2:2–2.

the offender suffers from a mental illness or psychological abnormality which was related to his crime and for which treatment is available; and (4) any likelihood that the crime was significantly related to any other condition or situation such as unemployment or family problems that would be subject to change by participation in a diversion program.

[*Courts, supra,* at 32]

Thus, PTI proponents and program administrators have criticized attempts to define admissions criteria according to criminal status or the particular crime with which a defendant is charged. Besides being arbitrary, such categorizations may bear only a tenuous relationship to the rehabilitative function of PTI. Because rehabilitation is dependent on an individual's propensity for correction, conditioning his admission solely on the nature of his crime may be both arbitrary and illogical. Greater emphasis should be placed on the offender than on the offense.

Having made this inquiry into the general purposes and standards of PTI, we will now examine the pretrial intervention programs which have been authorized under *R.* 3 :28. Our review in this regard will permit an assessment of how closely New Jersey programs approximate the general purposes of pretrial intervention, and will place the appeals before this Court within a proper perspective.

B. *Development of PTI in New Jersey*

The growth and development of PTI in New Jersey has paralleled its evolution at the national level. Motivated by the same general concerns which prompted the establishment of PTI programs in other jurisdictions (*compare* Chief Justice Burger, "No Man is an Island," 56 *A. B. A. J.* 325 (1970) *with* Editorial, "A Right to Rehabilitation?", 93 *N. J. L. J.* 792 (1970)), New Jersey has assumed an advanced position among the states which have implemented the concept of pretrial intervention. Despite this distinction, the development of PTI in New Jersey has not been uniform and the progress which has been achieved by different programs has not been even.

The enabling court rule under which existing PTI programs have been established (*R.* 3:28) was adopted in 1970 as this Court's authorization for the Newark Defendants Employment Project, one of the eight federally funded "second-round" programs. Most subsequent PTI programs in this state have been based both on the Newark project and on the rule which this Court adopted for that program. *See generally, Proposal, supra* at 9–10, 12–13; Note, *supra,* 28 *Rutgers L. Rev.* at 1208 *n.* 34; *Pressler, Current N. J. Court Rules,* Comment *R.* 3:28 at 457–458.[10]

The influence of the pilot project can be seen in the procedure which has been employed in establishing and admintering PTI programs under *R.* 3:28. All programs must in the first instance secure the approval of this Court as to the rules and regulations under which the program will operate. After the proposed program is approved, the assignment judge for the county must designate a judge or judges to hear all matters pertaining to the admission and functioning of the program, *R.* 3:28(a), except that the assignment judge himself must hear all cases concerning specified

---

[10]Since its adoption in 1970, *R.* 3:28 has undergone several changes whose general intent was to expand the scope of PTI. The first of these amendments, effective September 10, 1973, clarified the applicability of *R.* 3:28 to programs other than employment-oriented projects which had, until then been the only type of rehabilitative program associated with the PTI concept. By adding the words "or other diversionary programs including drug or alcoholic detoxification programs," the amendment assured that the revised rule would be "broad enough in application to include other types of diversion programs." 96 *N. J. L. J.* 449, 462 (1973).

More extensive changes were undertaken by a later amendment which became effective on April 1, 1974. The first of these changed the procedure's name from the original "Defendants' Diversionary Programs" to "Pretrial Intervention Programs." More substantive changes were also made "to expand the scope of the program providing greater flexibility for the disposition and supervision of the accused during the adjustment period." *Pressler, supra,* at 457. These amendments in a collateral fashion, however, also protected a defendant's interest in gaining admission to a PTI program. Thus, where a county program director, a prosecutor, or the court itself

heinous crimes such as treason, murder, kidnapping, man-slaughter, sodomy, rape, armed robbery, and distribution of narcotics by persons who are not drug-dependent. *R.* 3:28 (a).

After a person's arrest and during his initial appearance in court, the committing judge shall inform the suspect of the availability of a PTI program if one has been established in that county. *R.* 3:4-2. The judge shall also inform the defendant of the name of the program director and the general procedure by which an application can be made to the program.

After an application is filed, the matter is referred to the judge who has been designated by the assignment judge to hear such matters pursuant to *R.* 3:28(b). Where a defendant meets the preliminary eligibility criteria, the designated judge may upon recommendation of the program director (who most likely will be the county's trial court administrator or its chief probation officer) and the prosecuting attorney, postpone all further proceedings against the defendant for a three month period. *R.* 3:28(b). In the

recommended that admission be denied and the prosecution proceed, the individual was to be afforded an opportunity to be heard on the matter with the assistance of counsel. *R.* 3:28(c)(3). To further the rehabilitative function of PTI, the addition of paragraph (c)(4) made admissions and statements by a defendant during his enrollment and participation in a program, inadmissible at any subsequent trial. This provision also made the contents of reports compiled during a defendant's enrollment inadmissible at trial. A final amendment to the rule limited the number and duration of postponements of prosecution which a prosecutor could request in connection with participants in a PTI program. *R.* 3:28(d). *Pressler, supra,* at 457-58; *Proposal, supra,* at 10-11; *Note,* 28 *Rutgers L. Rev.* at 1210.

In conjunction with these changes in the PTI enabling rules, *R.* 3:4-2 (which concerns the procedure to be followed after the filing of a complaint against a defendant) was concurrently amended to conform with the revisions in *R.* 3:28. By this amendment, a defendant was to be informed at a preliminary hearing of the existence of a PTI program if the county in which the hearing was held had established such a program. The court was also to explain the enrollment process to assist the defendant if he wished to avail himself of the procedure. *Pressler, supra,* Comment *R.* 3:4-2 at 330.

intervening three months, the defendant is to participate in the rehabilitation program which has been established by the county. Because neither the form nor the content of these programs has been prescribed by $R$. 3:28, the resulting services vary according to the objectives of the respective programs. At the end of three months, the judge may dispose of the case in one of several ways. Upon the recommendation of the program director, and with the consent of the prosecuting attorney, the judge may dismiss all outstanding complaints, indictments or accusations against defendant. $R$. 3:28(c)(1). This disposition, however, is contingent upon certification by program officials that the defendant has successfully participated in the PTI program and has been rehabilitated. With the concurrence of either of the previously mentioned officials, or upon the court's own motion, the judge may order the prosecution of defendant. $R$. 3:28(c)(3). However, prior to entering such an order, the defendant and his attorney must be given notice of the order and may request a hearing before the judge on that disposition. $R$. 3:28(c)(3). Should the designated judge eventually order that the defendant be prosecuted, any admissions or statements made by the defendant and all reports compiled during his enrollment in the program shall be considered inadmissible at trial. $R$. 3:28(c)(4). As an interim measure, the designated judge may also postpone further proceedings for an additional three-month period. $R$. 3:28(c)(2). This option, which must be recommended by the program director and consented to by the prosecuting attorney, may be employed only once. $R$. 3:28(d). After the conclusion of the second three-month period, the designated judge must either dismiss the case, or order the prosecution to proceed. $R$. 3:28(d).[11]

---

[11]The only exception to this general rule arises where the defendant exhibits a dependency upon a controlled dangerous substance. In such cases, upon the recommendation of the program director and with the consent of the prosecuting attorney, the judge may "grant

· Within this broad procedural framework, there is considerable room for variation in the development and implementation of county programs. This discretion is particularly noticeable in the different types of rehabilitation programs which have been established within counties that have adopted PTI. Some of these programs, most notably the Newark Defendants' Employment Project and the Hudson County Pretrial Intervention Project, have a broad orientation; admission to them is available to defendants charged with almost any criminal offense. The Newark TASC/Pretrial Intervention Program, however, has a more restrictive admissions policy, and concentrates primarily on individuals whose criminal problems are related to drug-abuse. A third type of program, such as the Jersey City and Union County Rehabilitation Programs, attempts to divert those criminal cases which arise from a pattern of alcoholism. The individuality which marks these different programs may be observed in other aspects of their operation including the services which are afforded to defendants, the point in the criminal process at which a defendant may be diverted, and the civil and social agencies with which the program is associated. *See Proposal, supra,* at 12–18. Nat'l Pretrial Intervention Service Center, *Directory of Criminal Justice Diversion Programs,* 8 (rev. 1975); Zaloom, "Pretrial Intervention Under New Jersey Court Rule 3:28, Proposed Guidelines for Operation," 2 *Crim. Justice Q.* 178, 182–186 (1974); *Descriptive Profiles, supra,* at 40–44.

In this regard the appeals represented by the instant case all concern the manner in which a county has attempted to fill the broad interstices created by *R.* 3:28. Each of these appeals implicates some exercise of discretion by an official connected with a PTI program. Consequently, in all three appeals, we are asked to consider and sanction the procedural

such further postponements as he or she deems necessary to make an informed decision." *R.* 3:28(d). The aggregate duration of such postponements however may not exceed one year. *R.* 3:28(d).

practices which the program has adopted, pursuant to *R.* 3:28, as measured against constitutional standards and the original purposes of pretrial intervention.

## II

## *APPEALS BEFORE THE COURT*

A. *The Leonardis and Rose Appeals*

Defendants Leonardis and Rose argued before this Court that their applications for admission to the pretrial intervention program of Bergen County were improperly denied. As previously noted, they were denied admission because the crimes with which they were charged fell within the ambit of the program's exclusionary criteria without any individualized consideration of the offender. While the defendants challenge the validity of such criteria on equal protection grounds, their primary objection concerns the perfunctory manner in which their applications were reviewed by officials in the Bergen County program. Defendants allege that the decision of the trial judge was founded upon insufficient information, and that in fact, no file was ever prepared regarding their eligibility for the program. This, they contend, resulted from a preliminary determination by county officials that the exclusionary criteria of the Bergen County program automatically precluded consideration of applicants who were charged with controlled dangerous substances crimes. Although defendants concede that their cases are within the exclusionary criteria, they nonetheless argue that the criteria are not mandatory in nature. The criteria expressly provide that heinous crimes are "ordinarily [to] be excluded," and hence this means that they are not necessarily excluded. The State does not meet this contention. Instead it argues that courts in general lack jurisdiction to hear appeals arising under *R.* 3:28 and that equal protection considerations are not implicated by the exclusionary criteria in the Bergen County program.

We first address the jurisdictional argument. Clearly, if we lack the jurisdiction, further consideration of the issues presented in this case is unnecessary. The State bases its contention on the fact that *R.* 3:28 does not expressly provide for appellate review of determinations by the program director, the prosecuting attorney, or the designated judge. Although the State concedes that a hearing must be furnished pursuant to *R.* 3:28(c)(3), it contends that this proceeding is only available to candidates who have been denied the required consent of the program director and the prosecuting attorney but are otherwise eligible for admission. The appeals of Leonardis and Rose, the State argues, are distinguishable because the defendants fail to meet other prerequisites of the program besides the consent requirement.

While we recognize the imprecision of *R.* 3:28 and the general proposition that appellate review in a criminal case is not mandated by due process of law, *McKane v. Durston,* 153 *U. S.* 684, 14 *S. Ct.* 913, 38 *L. Ed.* 867 (1894); *Griffin v. Illinois,* 351 *U. S.* 12, 21, 76 *S. Ct.* 585, 100 *L. Ed.* 891, 900 (1956) (concurring opinion); *Ross v. Moffitt,* 417 *U. S.* 600, 610–611, 94 *S. Ct.* 2437, 41 *L. Ed.* 2d 341, 351 (1974), we find neither factor to be dispositive of this issue. We are not here concerned with the interpretation of a statutory scheme which prescribes one, two or no appeals. Rather, we are involved with the interpretation of a court rule.

By express provision of the New Jersey Constitution,[12] this Court has been vested with power to make rules concerning the administration, practice and procedure of the courts of this State. This power has been broadly construed

---

[12]Article VI, Section 2, paragraph 3 of the 1947 New Jersey Constitution provides:

The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.

[*N. J. Const.* (1947), Art. VI, § II, par. 3]

to include not only the promulgation of such rules, but their interpretation and enforcement as well. *John S. Westervelt's Sons v. Regency, Inc.,* 3 *N. J.* 472 (1950) ; *State v. Rush,* 46 *N. J.* 399 (1966). Thus, in *In re Mattera,* 34 *N. J.* 259 (1961), Chief Justice Weintraub observed:

> [T]his court is charged with responsibility for the overall performance of the judicial branch. Responsibility for a result implies power reasonably necessary to achieve it. More specifically, the power to make rules imports the power to enforce them.
>
> [34 *N. J.* at 272].

 As implied by this statement, our powers of enforcement under this provision also include the power to review the operation of court initiated procedures and to review the legal determinations made pursuant to these procedures. Our failure to do so would be an abdication of the rule-making authority with which we have been entrusted. Any interlocutory order of a trial court is appealable by leave of court. *R.* 2:2. Thus, regardless whether appellate review was expressly provided in *R.* 3:28, we find the instant matter to be judicially cognizable.[13]

---

[13]Our determination in this regard is supported by two recent California cases which interpreted that state's statutory pretrial intervention scheme, in *Cal. Penal Code,* § 1000 *et seq., People v. Reed, supra,* 37 *Cal. App.* 3d 369, 112 *Cal. Rptr.* 493 (Ct. App. 1974) ; *People v. Superior Court of San Mateo County,* 11 *Cal.* 3d 59, 113 *Cal. Rptr.* 21, 520 *P.* 2d 405 (Sup. Ct. 1974). In these cases, the defendants, like Leonardis and Rose in the instant case, had been charged with the possession of marihuana and had applied for admission to a local PTI program. Although the defendants in *Reed* and *Superior Court* were both technically eligible for admission, they failed to obtain the necessary consent from the prosecuting attorney. On appeal, the California courts upheld the defendants' interests and ordered their admission despite the prosecutor's objections. These decisions were based upon the explicit finding that pretrial intervention is a judicial function, in spite of the fact that the California PTI programs, unlike those in New Jersey, are legislative in origin. Consequently, the courts found that the exercise of a prosecutorial veto within the PTI programs would represent an encroachment on judicial prerogative. The California Supreme Court

In the instant case, defendants have been found ineligible for admission to the Bergen County PTI program by virtue of their having committed "heinous crimes" as defined by the exclusionary criteria. Through the application of these criteria, defendants have been automatically precluded from participating in the county's program. Defendants argue that the exclusionary criteria of the Bergen County program are only suggestive of those cases which "ordinarily" are to be excluded and are not mandatory in their operation. *See* footnote 3, *supra*. Because the program's officials reviewed their applications as if defendants were automatically excluded, defendants allege that there was no true determination of whether their respective cases were among those which "ordinarily" would have been excluded. In the alternative, defendants contend that the exclusionary criteria employed by the Bergen County PTI program are violative of the equal protection clause of the fourteenth amendment to the United States Constitution.

We find it unnecessary to reach either of the contentions raised by defendants. Instead, our decision rests on more fundamental deficiencies which we find inherent in the Bergen County PTI program and in its exclusionary criteria. Initially, we note that there was no malevolence on the part of the Bergen County program in adopting or administering

in *Superior Court* invalidated the provision of the PTI statute which establishes prosecutorial consent as a prerequisite to admission in a program as unconstitutional under the doctrine of separation of powers.

But cf. *Sledge v. Superior Court of San Diego County*, 11 *Cal.* 3d 70, 113 *Cal. Rptr.* 28, 520 *P.* 2d 412 (Sup. Ct. 1974), wherein the California Supreme Court upheld the authority of a district attorney to preliminarily determine the eligibility of defendant-applicants according to criteria prescribed by the California statute. The court specifically found that this determination was not an exercise of judicial power. The *Sledge* case, however, is distinguishable from the instant case by virtue of its limited scope. In *Sledge*, the court was only concerned with the prosecutor's exercise of discretion; in the instant case, we are not only concerned with the discretionary function performed by the prosecutor, but also with the criteria which he applied in the exercise of his discretion.

these exclusionary criteria. Our conclusions are rather based upon the statewide experience with PTI and upon our desire to expand pretrial intervention beyond the programs (such as that in Bergen County) which pioneered the concept. Thus our observations are intended to apply to other PTI programs in New Jersey which exhibit the same deficiencies which we now consider.

■ Our basic criticism of the Bergen County exclusionary criteria concerns the unduly restrictive impact which they may have on admissions into the program. In this regard, the criteria are inconsistent with the underlying liberal policy of *R*. 3:28. As a recent proposal for a uniform, statewide PTI program stated:

New Jersey's *R*. 3:28 contains no criteria limiting participation to any class of defendants, and although New Jersey programs use guidelines for exclusion, the guidelines show only those cases that are *ordinarily* excluded. Enrollment then, of the "offender rather than the offense" is the rule in New Jersey and appears to be the trend of development among programs nationally.

[*Proposal, supra,* at 49 emphasis in original]

As this excerpt suggests, exclusionary criteria should be intended as guidelines only and not as mandatory standards. A mandatory application of such criteria improperly restricts the operation of *R*. 3:28. Because both defendants were charged with "heinous offenses" as defined under the exclusionary criteria, program officials prepared no files in connection with their applications. In fact, in the case of Leonardis, the defendant was not even permitted to present a formal application for admission. Consequently, when the designated judge ruled on defendants' motions for admission to the Bergen County program, his decision was based on a record devoid of background material on the defendants' rehabilitative potential. Such clearly pertinent factors as Leonardis' employment, his unblemished record and the full-time student status of Rose never entered the decisions of either the program director or the designated judge. Our

objections to the criteria employed by the Bergen County program, however, transcend the manner in which they were applied.

We find that the exclusionary criteria accord misplaced emphasis to the offense with which a defendant is charged and hence fail to emphasize the defendant's potential for rehabilitation.[14] By restricting their initial consideration to an evaluation of the charges brought against defendant, the criteria ignore such important factors as the defendant's willingness to avoid conviction and its attendant stigma, the motivation behind the commission of the crime, the age and past criminal record of the defendant and his current rehabilitative efforts. By ignoring these factors, the criteria clearly contradict the rehabilitative purpose which underlies PTI. Because of these shortcomings, and because we feel that the future utility of PTI is dependent upon its uniform implementation on a statewide basis, we reject the Bergen County exclusionary criteria as absolute standards by which to evaluate defendants' applications.

This determination makes it unnecessary for us to reach the equal protection arguments posed by the defendants.

---

[14]On this point, Chief Justice Hughes delivered highly pertinent remarks during his service as Chairman of the American Bar Association Commission on Correctional Facilities and Services:

. . . [D]iversion of the "offender" rather than the offense charged emphasizes individual needs as the determining factor in participant eligibility. This change has taken hold in several of the projects. It is evidenced by increased intake of defendants charged with felony crimes and multiple offenses in the Baltimore, Hudson County, Minneapolis and Boston demonstrations. To accommodate the new class of eligibles, initial admission guidelines have been relaxed. Having won the confidence of local justice officials, the new flexibility has gained acceptance by courts and prosecutors. It attests to the credibility achieved by project administrators in their diversion work.

[*Hearing before the Subcommittee on National Penitentiaries of the Senate Comm, on the Judiciary on S. 798, Community Supervision and Services Act*, 382 (March 27, 1973)]

Although we recognize that such contentions have been rejected by other courts in their review of comparable programs, *Marshall v. United States,* 414 *U. S.* 417, 94 *S. Ct.* 700, 38 *L. Ed.* 2d 618 (1974) (upholding rejection of defendant's application for admission to rehabilitative treatment program under Title II of the Narcotic Addict Rehabilitation Act of 1966 (N. A. R. A.), 18 *U. S. C. A.* §§ 4251–55), the constitutional overtones which accompany a PTI admissions decision cannot be rejected out of hand. *See Proposal, supra,* at 28. This is especially true in light of the recent judicial willingness to accord protected status to social "privileges" which do not otherwise constitute a fundamental right. *Goldberg v. Kelly,* 397 *U. S.* 254, 90 *S. Ct.* 1011, 25 *L. Ed.* 2d 287 (1970). We nonetheless defer such considerations until another day, and decline to determine this cause on constitutional grounds. *But see, State v. Nolfi, supra,* 141 *N. J. Super.* at 537.

Within the context of the appeals presented by Leonardis and Rose, we reverse the judgment of the Appellate Division. We remand these appeals to the trial court for a determination of whether intervention would be appropriate under *R.* 3 :28 and the Bergen County program as modified. The court's determination in this regard should be premised upon its assessment of all the favors identified as relevant by this opinion. In no case, however, should the trial court deny a hearing or refuse intervention solely by reason of the nature of the crime of which the defendant is accused.

B. *The Strychnewicz Appeal*

This appeal, unlike those of Leonardis and Rose, concerns the PTI program of Hudson County and asks whether a prosecutor may refuse to articulate his reasons for declining to consent to a defendant's admission into a PTI program, such consent being a prerequisite to admission under *R.* 3 :28. This question comes before us on motion by the Hudson County prosecutor for leave to appeal an unfavorable

determination by the county's designated judge. Our inquiry in this regard concerns whether the purposes of PTI or pertinent standards of constitutional law require that the prosecutor set forth his reasons for refusing to give his consent.

We first note that compelling a prosecutor to furnish reasons for his decisions is not only consistent with the goals of PTI, but tends to further their implementation. The National Advisory Commission on Criminal Justice Standards and Goals in its report on *Corrections* stated:

> If diversion programs are to perform as they are intended, then the decisions of those referring to these programs must be subject to review and evaluation. . . .
> The first step in establishing accountability is to disclose the basis of decisions. Too often the rationale for discretionary decisions is undisclosed and unstated. Simply requiring written statements for each decision forces the process to become more open while it also permits administrative or judicial review. Review can be through the courts, the legislature, or whatever source seems most appropriate in seeing that goals have been achieved and standards complied with.
> [*Corrections, supra,* at 96]

Additional reasons exist for requiring disclosure. First, as we have already noted, our power to enforce court rules, especially in the context of *R.* 3:28, necessarily includes the power to review decisions made pursuant to those rules. In order to facilitate such review, courts require a record setting forth reasons for the decision which is to be reviewed. *Monks v. N. J. State Parole Bd.,* 58 *N. J.* 238 (1971).

Second, as a relatively recent innovation, pretrial intervention may still be described as essentially experimental. Experience with PTI in New Jersey illustrates that such programs may assume a variety of forms and serve a variety of functions. While we feel that the PTI concept is now well established in this State, we, nonetheless, appreciate the need for experimentation, evaluation, assessment and modification of programs. *See generally, Descriptive Profiles, supra; Courts, supra* at 31. A requirement that prosecutors (and, for that matter, judges and program administrators)

justify their decisions on individual applications will provide a valuable source of information for purposes of future evaluation. In addition, an explanation of a prosecutor's decisional basis will assist the in-house reviews which we anticipate county programs will perform on their own. *Proposal, supra* at 56.

Finally, providing a defendant with reasons for the denial of his application will not only allow a defendant to adequately prepare for judicial review of that decision, but will also promote the rehabilitative function which the PTI concept serves. At the very least, disclosure will alleviate existing suspicions about the arbitrariness of given decisions and will thereby foster a respect for the fair operation of the law.

Our recognition that the decision to admit or reject an applicant for pretrial intervention is an exercise of quasi-judicial power obviates our need to discuss the analogies that the parties draw between PTI programs and administrative agencies.[15] Within a wholly judical sphere we are not con-

---

[15]The court in *People v. Superior Court of San Mateo County, supra,* rejected such an analogy between the California PTI program and an administrative agency:

It is argued that the diversion hearing is not a typical criminal trial in which the defendant's liberty is placed in jeopardy, but a "quasi-administrative" inquiry into his suitability for a civil treatment program. It is obvious, however, that a court hearing need not be a full-fledged criminal trial in order to constitute an exercise of the judicial power. Whatever label may be attached to it, the diversion hearing mandated by section 1000.2 is by its terms a judicial proceeding. First, the court does not simply rubber-stamp the recommendation of the probation report. Rather, it undertakes a "consideration" of that report and of "any other information considered by the court" to be relevant to the issue. This statutory language clearly contemplates that the court may take evidence, hear argument, and find the operative facts. These are judicial acts. Applicable here is our reasoning in *Esteybar* (5 Cal. 3d [119] at p. 127, 95 Cal. Rptr. [524] at p. 529, 485 P. 2d [1140] at p. 1145) that "Within the statutory framework, the magistrate at a preliminary hearing acts as an independent arbiter of the issues presented by the adversaries. He weighs evidence,

fronted by potential conflicts with either the executive or the legislative branches of our government; similarly, we are not faced with the need to defer to the expertise of an administrative body.

Nonetheless, even if we were to recognize such analogies, our reading of the relevant case law on both the federal and state levels would inevitably lead us to the same conclusion. Since 1951, the courts of this country have followed the basic proposition enunciated by Justice Frankfurter in a concurring opinion in *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 *U. S.* 123, 71 *S. Ct.* 624, 95 *L. Ed.* 817 (1951), that procedural protections are invoked in an administrative proceeding when an individual is confronted with a "grievous loss" of liberty or property. More recent extrapolations of that principle suggest that the potential loss to which Justice Frankfurter alluded is not confined to interests of constitutional dimension but may encompass other privileges as well. *Goldberg v. Kelly, supra; Wolff v. McDonnell*, 418 *U. S.* 539, 94 *S. Ct.* 2963, 41 *L. Ed.* 2d 935 (1974); *Shapiro v. Thompson*, 394 *U. S.* 618, 627, n. 6, 89 *S. Ct.* 1322, 22 *L. Ed.* 2d 600, 611 (1969). An extension of this reasoning has been applied by our own Court. *Avant v. Clifford*, 67 *N. J.* 496, 519 (1975)[16]; *In Interest of*

resolves conflicts and gives or withholds credence to particular witnesses [citation], and just as these are judicial acts, so is the act of holding a defendant to answer. To accept the People's contention would be to reduce this function to an ex parte act and render meaningless the magistrate's independent determination. [113 *Cal. Rptr.* at 26–27, 520 *P.* 2d at 410].

16Chief Justice Hughes for the Court in *Avant v. Clifford, supra,* stated:

While we consider here procedural due process in its constitutional sense, it should also be remembered that in the exercise by New Jersey courts of their function of review (as here) of the action of administrative agencies (such as the Department of Institutions and Agencies), we have not been satisfied with enforcement of naked constitutional right, but have gone further to strike down arbitrary action and administrative abuse and to insure procedural fairness in the administrative process.
[67 *N. J.* at 520]

*D. G. W.,* 70 *N. J.* 488, 501–502 (1976). Consequently, we must reject the argument presented by *amicus curiae,* New Jersey Prosecutors Association, which suggests that denial of admission to a PTI program will have "only one effect" on the rejected candidate — that is, to require the defendant to proceed in due course with a regular criminal trial. This sort of reasoning would negate the potential value which PTI serves in seeking the rehabilitation of defendants. Furthermore, we regard defendant's interest in achieving diversion without plea or trial to be so important, that we are unwilling to overlook the advantages of participating in a PTI program.

This judicial concern for the protection of specially-designated interests and privileges is evidenced by a judicial willingness to impose a requirement on administrative agencies that they provide a statement of reasons for their actions. By facilitating appellate review of agency determinations, such statements protect defendants from the arbitrary actions of an agency. 2 *Davis, Administrative Law,* § 16.05 at 446–48 (1958). Thus, in *Donaldson v. N. Wildwood Bd. of Educ.,* 65 *N. J.* 236 (1974), Justice Jacobs noted the importance of providing a statement of reasons to a teacher who sought review of a school board's failure to renew his contract:

If he is not reengaged and tenure is thus precluded he is surely interested in knowing why and every human consideration along with all thoughts of elemental fairness and justice suggest that, when he asks, he be told why. Perhaps the statement of reasons will disclose correctible deficiencies and be of service in guiding his future conduct; perhaps it will disclose that the nonretention was due to factors unrelated to his professional or classroom performance and its availability may aid him in obtaining future teaching employment; perhaps it will serve other purposes fairly helpful to him as suggested in *Drown* [Drown v. Portsmouth School District, 435 F. 2d 1182 at 1184–1185 (1 Civ. 1970)] ; and perhaps the very requirement that reasons be stated would, as suggested in *Monks* . . ., serve as a significant discipline on the board itself against arbitrary or abusive exercise of its broad discretionary powers.

[65 *N. J.* at 245].

A similar rationale was employed by this Court in other situations which concerned the exercise of administrative discretion. *Avant v. Clifford, supra* (prison disciplinary boards) ; *Fanwood v. Rocco,* 33 *N. J.* 404, 416 (1960) (municipal governing body granting liquor licenses) ; *Abbotts Dairies v. Armstrong,* 14 *N. J.* 319, 332–333 (1954) (Director of Office of Milk Industry issuing price-fixing orders).

Our attention in this regard is drawn to cases on both the federal and state levels which have required a statement of reasons from agencies responsible for granting parole and probation, under circumstances which are procedurally analogous to pretrial intervention. The United States Supreme in *Morrissey v. Brewer,* 408 *U. S.* 471, 487, 92 *S. Ct.* 2593, 33 *L. Ed.* 2d 484, 498 (1972) and *Gagnon v. Scarpelli,* 411 *U. S.* 778, 791, 93 *S. Ct.* 1756, 36 *L. Ed.* 2d 656, 666–67 (1973) imposed such a requirement where administrative authorities sought to revoke these privileges from a defendant. These decisions, however, were preceded by our own decision in *Monks v. N. J. State Parole Bd., supra.* Defendant in that case appealed from a refusal by the State Parole Board to provide reasons for denying him parole. In his opinion for the Court upholding defendant's position, Justice Jacobs made an observation which is as applicable to PTI as it was to the parole process in *Monks*:

> The need for fairness is as urgent in the parole process as elsewhere in the law and it is evident to us that, as a general matter, the furnishing of reasons for denial would be the much fairer course; *not only much fairer but much better designed towards the goal of rehabilitation.*
>
> [58 *N. J.* at 246; emphasis supplied]

The Court in that case, also addressed the supposed burden which the furnishing of reasons would impose on the agency — an argument which was raised by Hudson County prosecutor in the instant case. In this regard, the Court stated:

So here, fairness and rightness clearly dictate the granting of the prisoner's request for a statement of reasons. That course as a general matter would serve the acknowledged interests of procedural fairness and would also serve as a suitable and significant discipline on the Board's exercise of its wide powers. It would in nowise curb the Board's discretion on the grant or denial of parole nor would it impair the scope and effect of its expertise. It is evident to us that such incidental administrative burdens as result would not be undue; the reported experiences in the jurisdictions which have long furnished reasons have given us no grounds for pause.

[58 *N. J.* at 249]

■ The courts which have required that a statement of reasons be furnished to defendants have remained cognizant of considerations which mitigate against this procedure. Thus, as this Court stated in *Monks,* reasons are to be furnished, "while providing for such reasonable exceptions as may be essential to rehabilitations and the sound administration of the parole system." 58 *N. J.* at 249–50. *See also, Morrissey v. Brewer, supra,* 408 *U. S.* at 487–88, 92 *S. Ct.* at 2603–04, 33 *L. Ed.* 2d at 497–98. Accordingly, we find that a statement of reasons for denial of consent by a prosecutor should ordinarily be afforded to all applicants for admission to a PTI program. Where furnishing reasons to defendant would be unduly prejudicial to law enforcement efforts, for example, by requiring the revelation of confidential or sensitive information from an informant, the prosecutor may apply to the designated judge for an *in camera* hearing. At this hearing, the prosecutor would be required to present justification for his reluctance or refusal to state reasons. The judge would thereafter determine whether the State's interest sufficiently outweighed the interest of the defendant in obtaining a statement of reasons.

Insofar as this case is concerned, therefore, we affirm the order of the trial court requiring the prosecutor to give reasons for his refusal to consent to defendant's participation in the county PTI program, and remand for further proceedings consistent with this opinion.

## III

### CONCLUSION

Our consideration of the three appeals presented in this case has identified several deficiencies in the two PTI programs from which these appeals arose. In making these observations, we do not point a finger at either the officials who have proposed those programs or those who currently administer them. We take judical notice of the fact that the same deficiencies, and others of a comparable nature, exist in PTI programs throughout the State. While we do not condone these deficiencies, we nonetheless recognize that they are the attendant by-products of a program which is still experimental in nature. *See Marshall v. United States, supra,* 414 *U. S.* at 429, 94 *S. Ct.* at 707, 38 *L. Ed.* 2d at 628. Moreover, the salutary purposes which the PTI program is designed to serve recommend its continuance, even if that decision necessitates certain modifications. We are guided in this respect by the words of Justice Brandeis:

To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. [*New State Ice Co. v. Liebmann*, 285 *U. S.* 262, 311, 52 *S. Ct.* 371, 386, 76 *L. Ed.* 747, 771 (1932) (dissenting opinion)].

Our faith in the continued operation of the PTI program in New Jersey demands that we remedy the deficiencies which we have identified. We find that these deficiencies are the result of two aspects of *R.* 3:28.

The first is the diversity that exists among programs which have been established in this State. Of course, if such programs were founded under the auspices of municipal governments, we could understand such differences. However, within a state-administered system, such discrep-

ancies may no longer be tolerated, absent a rational basis for such distinctions. At the very least, the differences which distinguish the various programs implicate considerations of equal protection, particularly in counties in which no PTI programs have been established. Because we find the purposes of the PTI concept to be so salutary, and because we think the programs based on that concept should be accessible to every citizen of the State, we conclude that there exists a need for statewide implementation of the PTI program.

The second aspect of the overriding problem which we consider in this case concerns the virtually untrammeled discretion which has been vested in prosecutors associated with the PTI programs. The broad interstices of *R.* 3:28 have permitted much leeway to prosecutors in the manner in which they administer the enabling court rule. Although we foresee a continued exercise of discretion by prosecutors, we cannot sanction a decisional process which might yield *ad hoc* or arbitrary determinations. A decisional process of that sort defeats the formal guidelines which the PTI programs attempt to place on prosecutorial discretion. Thus, as the National Advisory Commission on Criminal Justice Standards and Goals noted, "the programs are planned interventions, not simply the result of chance fluctuations in the broad range of discretions represented in the justice system." *Corrections, supra,* at 84.

To delimit the exercise of discretion and to afford guidance to all prosecutors in reaching their PTI decisions, we find that statewide PTI programs should be implemented according to uniform guidelines. Until such guidelines are formally adopted, prosecutors shall be guided by *R.* 3:28 and the programs adopted within their counties. These shall be modified and implemented on a uniform and statewide basis in the following respects:

1) Defendants who have been accused of *any* crime shall be eligible for admission to a program.

2) Defendant's admission to a PTI program should be measured according to his amenability to correction, responsiveness to rehabilitation and nature of the offense with which he is charged.

3) Although a trial-type proceeding is not necessary, defendant shall be accorded an informal hearing before the designated judge for a county at every stage of a defendant's association with a PTI project at which his admission, rejection or continuation in the program is put in question. A disposition is appealable by leave of court as any interlocutory order. *R.* 2:2–2.

4) Defendant shall be accorded the procedural protection of a statement of reasons after each determination of his admission, rejection or continuation in a PTI program.

We reverse and remand in the appeals of Leonardis and Rose. We affirm and remand in the appeal of Strychnewicz.

*For reversal and remandment in Leonardis and Rose and for affirmance and remandment in Strychnewicz*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*Opposed*—None.